UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| RODNEY JONES | CIVIL ACTION NO. 04-1565-P |
| versus | JUDGE HICKS |
| PAM HEARN, ET AL. | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

**Introduction**

Rodney B. Jones ("Plaintiff") is an inmate confined at David Wade Correctional Center. He alleges the prison medical director, Pam Hearn, M.D., and prison nurse Karen White (LPN) violated his constitutional rights when White incorrectly performed a tuberculosis test on Plaintiff and required him to take unnecessary medication that caused severe side effects. Plaintiff filed a Motion for Summary Judgment (Doc. 38), and Defendants responded with their own Motion for Summary Judgment (Doc. 43). It is recommended, for the reasons that follow, that Plaintiff's motion be denied and Defendants' motion be granted.

**Relevant Facts**

Plaintiff's motion, as well as his opposition to Defendants' motion, is accompanied by a well-written and detailed 27-page declaration made pursuant to 28 U.S.C. § 1746. Such a statement has been recognized as competent summary judgment evidence. Hart v. Hairston, 343 F.3d 762, n. 1 (5th Cir. 2003). Defendants have submitted their own summary

judgment evidence but, to the extent there is a conflict between these submissions, Plaintiff's version of the facts governs for summary judgment purposes. Both Plaintiff and Defendants set forth the facts in great detail and include voluminous medical records. It is not necessary to explore all those facts in detail to resolve the pending motions. A fair summary of the facts represented by the summary judgment evidence will be set forth below.

Tuberculosis is a highly contagious and potentially fatal disease that can spread rapidly in a prison. The Louisiana Department of Public Safety and Corrections adopted Health Care Policy No. HC-09A to address the management of tuberculosis in its facilities. The policy requires that inmates be tested upon intake into the system and that yearly testing or medical evaluation be done thereafter. Inmates are tested by injecting a small amount of purified protein derivative (PPD) tuberculin intradermally into the inner surface of the forearm. After 48 to 72 hours, the injection site is inspected for induration (a hard spot) by a trained health care worker. An induration of 10 mm or greater is a significant (and positive) reaction. All inmates who have a positive skin test are to receive counseling and recommended treatment.

There is a 10% incidence of tuberculosis disease developing in persons with PPD of 10 mm or greater who do not receive treatment for the latent infection indicated by the test. Because of that proven risk and the danger of tuberculosis spreading in incarcerated populations, the Department's policy requires that all inmates with a PPD of 10 mm or greater be prescribed INH prophylaxis unless they have a history of chronic liver disease, use

Dilantin, or there are other contra-indications. If an inmate refuses to take INH prophylaxis, the Department requires him to sign a Refusal to Accept Medical Care form. The inmate will then be observed closely for evidence of future active disease. The policy states that the observation may be done in a lockdown setting or in medical isolation, based on the recommendations of the Medical Director, in conjunction with the Unit Head. The isolation is to be continued until compliance with evaluation and/or treatment recommendation is achieved.

Plaintiff testifies that on May 9, 2004 at about 9:00 a.m., a nurse attempted to administer the PPD test. He refused to allow that nurse to perform the test because of a prior bad experience when she was taking a blood sample. Plaintiff explained that he was not refusing the test; he simply refused to allow that nurse to administer it. Plaintiff also refused to complete a Refusal to Accept Medical Care form. On May 10, at about 12:30 a.m., a different nurse came to Plaintiff's cell, and Plaintiff allowed her to inject the PPD.[1]

On May 11 at about 8:00 a.m., Nurse Karen White (a defendant) came to Plaintiff's cell and said she needed to check the result of his test. Plaintiff explained he did not receive his test 48 hours earlier with the other inmates and, because he received the test much later in the day, the requisite 48 hours had not passed. White allegedly told Plaintiff that it was his fault he did not test with the other inmates and that "This is not Burger King," so Plaintiff

---

[1] Plaintiff testifies that the injection occurred just after midnight in the early hours of May 10. Medical records attached to Plaintiff's motion indicate, however, that the test was administered at 11:00 p.m. on May 9, but the difference is only 1-1/2 hours. Doc. 38, Exhibit G-2.

was ordered by a correctional officer to put his arm through the food tray hatch for inspection. Nurse White exclaimed that Plaintiff was positive, but he responded that what she saw was an allergic reaction that happens every time he takes a TB test. The reaction goes away within 48 hours. When Nurse White said Plaintiff was going to get some medication, he said he would not take medication based on an incomplete test. She allegedly smiled and sarcastically said: "Yeah, we'll see."

Department policy plainly requires that at least 48 hours must pass before the injection site can be interpreted. Both Nurse White and Dr. Hearn agreed, in their answers to interrogatories, that 48 hours was the minimum period. Doc. 38, Exhibits D-5 and E-4. An encyclopedia entry submitted by Plaintiff at Doc. 38, H-2, explains why the 48-hour delay is necessary. It states:

> At times a reaction is seen which reaches its peak in about 24 hours. This represents hypersensitivity to some component other than tuberculo protein and is usually not a source of confusion if the test is read at 48 or 72 hours.

Plaintiff testifies he has such a sensitivity, that he explained it to Nurse White, and she nonetheless intentionally based her assessment on a premature reading and without measuring the dermal reaction or even physically touching Plaintiff.

Three days later, an officer arrived at Plaintiff's cell and announced "pill call." Plaintiff said there must be a mistake, but the officer said that the medical department had directed that he receive TB medication on Mondays and Fridays for six months. Plaintiff tried to explain about the premature interpretation, but the officer told him the medication

was mandatory. Plaintiff invoked his right to refuse the medicine, but several officers were summoned to the scene and Plaintiff was told he was going to take the medication one way or the other. Plaintiff says he feared for his personal safety, so he ingested the medication. Neither of the two defendants was present during this event.

Neither Dr. Hearn nor Nurse White disagree that the PPD test was interpreted prematurely. Both testify that Plaintiff was administered the injection at 11:00 p.m. on May 9 and that the test was interpreted (sometime) on May 11. Neither defendant testifies as to the time of interpretation or attempts explain why a premature interpretation should be considered reliable. The issue of the test being interpreted too early is rather obviously avoided. Both Dr. Hearn and Nurse White do testify that, at some point: "It was explained to inmate Jones that if he refused to comply with the treatment prescribed, he would be required to remain in lockdown until it was determined that his plan of care should change or that he no longer required the medication." Doc. 43, Exhibit 2, ¶ 13 and Exhibit 3, ¶ 13.

In the months that followed, Plaintiff made several requests for medical treatment because of stomach pains and nausea, what Plaintiff believed were seizures, burning sensation during urination, vomiting, weakness, and parasthesia to his hands and feet. Plaintiff also complained of numbness in his tongue and altered taste capacity, which Plaintiff blames on the forced medication. Plaintiff was examined and prescribed medication or other treatment for these various problems. He also received treatment for a number of other complaints such as a cat scratch on his elbow, an injury to his wrist, pain in his elbow,

mental health concerns, and athlete's foot. Plaintiff testifies that he made several oral and written requests of various prison officials that he be allowed a second PPB test so he could stop taking the medication that caused him such significant side effects. Product information provided by Plaintiff indicates that the most frequent adverse reactions to the medication include parasthesia of the feet and hands, nausea, vomiting, memory impairment and, occasionally, progressive liver damage. Doc. 38, p. K-3.

Plaintiff testifies he took his final dose of the medication on November 12, 2004 but, despite his many complaints and requests to be retested, he was never examined by a physician until Dr. Hearn saw him on October 11, 2004. Plaintiff testifies that he begged Dr. Hearn to discontinue the medication, but she insisted he continue the four additional weeks required so he would not have to take the course of medication again.

Plaintiff testifies he was not provided counseling, as required by the Department policy following a positive test result, but he does not deny the testimony of Dr. Hearn and Nurse White that he was advised that if he refused to comply with the prescribed treatment, he would be required to remain in lock down until it was determined that his plan of care should be changed or that the medication was no longer required. Plaintiff admits that the first-step response to his May 2004 ARP grievance clearly stated: "If you are not compliant, you will remain in lockdown until it is determined your plan of care should change or you no longer require the medication."

**The Constitution and Inmate Medical Care**

For a convicted prisoner or pretrial detainee to prevail on a claim that his medical care (or lack of care) violated the Constitution, he must prove that prison or jail officials were "deliberately indifferent" to his "serious medical needs." Estelle v. Gamble, 97 S.Ct. 285, 291 (1976); Hare v. City of Corinth, 74 F.3d 633, 643 (5th Cir. 1996) (en banc). Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. Estelle, 97 S.Ct. at 291-92. Disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a constitutional claim for indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

**Analysis**

A Louisiana prisoner raised a similar challenge when he was required to undergo prophylactic treatment with INH because of a positive test. Unlike this case, however, it was undisputed in McCormick v. Stalder, 105 F.3d 1059 (5th Cir. 1997) that the inmate had tested positive. The prison policy then in place required all inmates who tested positive to (1) take the medication or (2) be isolated until the Unit Medical Director determined the degree to which isolation was necessary to protect staff and other inmates. Mr. McCormick alleged that he submitted to medication to avoid isolation. He was monitored for side effects during the course of treatment but, unlike Plaintiff, he did not complain of any side effects.

The district court dismissed Mr. McCormick's case as frivolous, and the Fifth Circuit affirmed. The Court recognized that the prison's interest in preventing the spread of tuberculosis is compelling, and it concluded the prison policy was a rational means of discharging the prison's duty to prevent the spread of disease. Mr. McCormick's Estelle claim for deliberate indifference to a serious medical need was rejected, as was his claim that substantive due process provided a right not to be forcibly medicated with INH. Plaintiff correctly points out key differences between his claims and those presented in McCormick, but McCormick is nonetheless indicative of prison officials' compelling interest in preventing the spread of disease and includes an express finding that a policy essentially identical to the one presented in this case is constitutional.

One of the strongest aspects of Plaintiff's case is his presentation of summary judgment evidence that indicates Nurse White knowingly and intentionally concluded Plaintiff's test prematurely so as to force Plaintiff to take medication he did not desire and that was not necessary. If the prison policy did not permit an alternative to taking the medicine in that situation, a jury trial might be required to test whether Plaintiff could actually prove those facts by a preponderance of the evidence.[2] An intentional misdiagnosis in order to force a prisoner to take medication that results in serious side effects could be found to amount to an unnecessary and wanton infliction of pain repugnant to the conscience

---

[2] Factual disputes in similar "conditions of confinement" prisoner cases are often resolved by a hearing held before a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B), followed by a Report and Recommendation. Such a procedure is not possible in this case because both parties have requested a jury trial. Absent consent of all parties, that jury trial would have to be conducted before a district judge. McAfee v. Martin, 63 F.3d 436 (5th Cir. 1995).

of mankind, which would violate the Eighth Amendment. But Plaintiff had a choice, medical isolation, by which he could have avoided taking the medication.[3]

Several courts have faced claims in which inmates raised religious or other objections to the PPD test itself. In many cases an inmate was faced with a choice (like the one in this case) that he either (1) undergo the medical procedure to which he objected or (2) remain in a segregated area for as long as a year. Such an option was deemed constitutional in Africa v. Horn, 998 F.Supp. 557 (E.D. Pa. 1998) (policy required inmate to submit to PPD test or be transferred to a restricted housing unit for one year for observation); Westbrook v. Wilson, 896 F.Supp. 504 (D. Md. 1995) (prison policy of placing inmates who refuse PPD testing into segregated custody is "perfectly constitutional"); Cannon v. Mote, 824 N.E. 2d 1227 (Ill. App. 4th Dist. 2005) (officials could constitutionally discipline an inmate by segregating him after he refused to submit to testing); and Rossi v. Portuondo, 714 N.Y.S.2d 816 (App. Div. 3d Dept. 2000) (placement of inmate in medical keeplock until he submitted to testing or showed no active signs of tuberculosis for one year was constitutional).

There are, of course, factual distinctions between this case and those cited. Plaintiff did not refuse the PPD test, but he did object to the medication that was administered as a result. That is a factual distinction, but the legal significance of the cited cases lies in the similarity between the choices afforded those inmates and Plaintiff: (1) submit to tuberculosis-related medical care directed by prison officials or (2) be moved from the

---

[3] Plaintiff testifies that a group of correctional officers, on the first occasion when he refused the medication, forced him through threats of physical harm to take the medicine. None of those correctional officers, however, was named as a defendant in this case.

general population to isolation for a period of observation. Plaintiff could have avoided the six-month regimen of medication that he now says was almost killing him by electing the isolation option. Plaintiff apparently valued his general population status and its attendant privileges more than he disliked the side effects of the medication that he believed was wrongfully prescribed, and he made his choice. Prison officials are given wide latitude to classify prisoners to various duties, make housing assignments and otherwise operate their facilities without micromanagement from federal judicial officials. Such actions by prison officials do not run afoul of due process concerns unless they result in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 115 S.Ct. 2293, 2300 (1995).

Plaintiff acknowledged in his declaration that he begged prison officials to allow him to refuse the medical treatment "without punitive ramifications," apparently referring to isolation status as a punitive ramification. He complains that the conditions of confinement would have included defective plumbing, infestation by insects and spiders, yelling by mentally ill inmates, suffering the effects of teargas being sprayed on other inmates, and fecal material covering the walls, bars and floors.[4] Of course, all of that is pure speculation because Plaintiff did not elect isolation. Had he made such a choice and actually encountered conditions sufficient to violate the Eighth Amendment, Plaintiff could have filed an ARP

---

[4] This court reviews numerous prisoner complaints from David Wade, and it has not seen any indication that conditions so terrible as Plaintiff describes exist anywhere in the prison.

grievance on that issue and then, if not satisfied, a Section 1983 complaint. Of course, the Eighth Amendment guarantees only that prison conditions will include the minimal measure of life's necessities, and it is not violated absent a showing that prison officials acted with deliberate indifference. <u>Woods v. Edwards</u>, 51 F.3d 577, 581 (5th Cir. 1995); <u>Harper v. Showers</u>, 174 F.3d 716 (5th Cir. 1999). Plaintiff chose to take medicine he claims was intentionally prescribed without a valid medical reason, but he could have avoided the medication by a change in housing assignment. Under the circumstances, he has not created a genuine issue of material fact with respect to a constitutional violation.

Accordingly,

**IT IS RECOMMENDED** that Plaintiff's **Motion for Summary Judgment (Doc. 38)** be **DENIED** and that Defendant's **Motion for Summary Judgment (Doc. 43)** be **GRANTED** and that Plaintiff's complaint be **DISMISSED WITH PREJUDICE.**

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that

party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 6th day of September, 2005.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE

cc: Judge Hicks